REISMAN CAROLLA GRAN & ZUBA LLP
Amelia Carolla, Esquire (I.D. #024651995)
19 Chestnut Street
Haddonfield, New Jersey 08033
856.354.0081
amy@rcglawoffices.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| R.S., by and through his parents, M.S. and N.S. and R.S., and M.S. and N.S., in their own right,<br><br>                                    Plaintiff, | Civil Action No. 23- |
| v. |  |
| EAST BRUNSWICK SCHOOL DISTRICT,<br>                                    Defendant. |  |

## COMPLAINT

### I.  INTRODUCTION

1.      Plaintiffs M.S. and N.S. ("Parents"), individually and on behalf of their son R.S. (collectively "Plaintiffs") file this action seeking reversal of a decision and order of an Administrative Law Judge ("ALJ") in a case arising under the Individuals with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973, as amended 29 U.S.C. § 794(a), the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; New Jersey's Special Education Law, N.J.S.A. 18A:46-1 et. seq, New Jersey's Law against Discrimination ("NJLAD"), N.J.S.A. 10:5-12(f), and their implementing regulations.

2.      This case involves placement of a child, R.S., who has Down syndrome. Plaintiffs contend, and this is not disputed, that the school District demanded a more restrictive placement

in a separate classroom for 3.0 hours of a 6.5-hour school day without first affording R.S. critical support of an individualized behavior improvement plan (BIP), a specialized assistive communication device (AAC), and support and training for district education teachers to enable them to include R.S. in the regular education classroom with modified instruction.

3.      Without data or experience including a child with Down syndrome, the Defendant East Brunswick School District ("District" or "Defendant") believes that R.S. could not be included because he is "not ready," and he needs to "master other skills before he could be ready for any kind of curriculum work." This belief that R.S. must "be ready" or "earn" his way into a regular education setting is a myth, a prejudice against the support-system needed for this child with Down syndrome.

4.      Unfortunately, after a six-day due process trial, the Administrative Law Judge Sarah G. Crowley bought this myth, and found in favor of the District, stating in a conclusory manner that "the testimony and documentary evidence presented by the District clearly demonstrated that R.S. is being provided FAPE in the LRE."

5.      Under *Oberti v. Board of Education of Borough of Clementon School District,* a court must engage in a two-part test for determining whether a school is following IDEA's LRE or "mainstreaming" requirement. 995 F.2d 1204, 1215 (3d Cir. 1992). First, the court must ascertain "whether education in the regular classroom, with the use of supplementary aids and services, can be achieved satisfactorily. Second, if the court find that for the child to benefit educationally, he must be placed outside the regular classroom, "the court must decide whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* (quoting *Daniel R.R. v. State Bd. of Educ.,* 874 F.2d 1036, 1048 (5th Cir. 1989)). Factors that inform the court's decision under the first prong include (1) the extent to which the school endeavored to

accommodate the child in the regular education classroom, including with supplementary aids and services; (2) a comparison of the likely educational benefits to the child from the regular program opposed to those from a special education program, and (3) the possible detriment to the other students' of the child's inclusion in a regular education classroom." *Id.* at 1216-17.

6.      The ALJ did not conduct this analysis in making the determination that R.S. was provided with FAPE in LRE.

7.      The IDEA seeks, as its mission, to *avoid* separate classes – *to the maximum extent appropriate* – for children with disabilities.

> To the maximum extent appropriate, children with disabilities. . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. §1412(a)(5)(A). Both Section 504 of the Rehabilitation Act ("Section 504") and Title II of the Americans with Disabilities Act ("ADA") have similar goals of achieving inclusion.

8.      Therefore, this reviewing Court must examine in the strongest manner possible whether the support or services of a specific BIP, AAC device, and training of and support to teachers on research-based modification of curriculum, were improperly left out of R.S.'s program before he was moved to a self-contained autism classroom for 3 of the 6.5-hour school day. Indeed, as the IDEA regulation states, supplementary aids and services must "be provided in conjunction with regular class placement." 34 C.F.R. § 300.115(b)(2).

9.      Considering a different placement without considering additional supports and services is flatly illegal. Here, there is no dispute that the District demanded "special classes, separate schooling or other removal of [a] handicapped child from the regular education environment." 20 U.S.C. § 1412(a)(5). There is no dispute that it did so based upon a *fiction* that

R.S. "belongs in a self-contained special education classroom in order to make any meaningful progress."

10.     "[A]ccumulated myths and fears about disability and disease are as handicapping as the physical limitations that from actual impairment." *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 284 (1987). "[O]ur assumptions often find comfort in our fears, prejudices, and ignorance. In turn, our fears, prejudices and ignorance often manifest themselves in discriminatory conduct." *EEOC v. Prevo's Family Mkt.*, 135 F.3D 1089, 1101 (6th Cir. 1998).  The ignorance in supports did result in discriminatory conduct, manifesting as denial of required supports and services and least restrictive environment.

## II.     PARTIES

11.     Plaintiff R.S. is a now nine-year-old student with a disability who is eligible for the services and protections of the IDEA.  He has diagnoses of Down syndrome and expressive-receptive language disorder.

12.     R.S. is also a qualified individual with a disability as defined in Section 504.

13.     R.S. is "otherwise qualified" for the educational programs provided by Defendant.

14.     R.S. was excluded from participation in and denied the benefits of and subjected to discrimination by Defendant.

15.     R.S. resides in East Brunswick, County of Middlesex, State of New Jersey.

16.     Plaintiffs, M.S. and N.S., are the father and mother of R.S. and live with him in East Brunswick.

17.     The District is a local educational agency (LEA) under the IDEA, 20 U.S.C. § 1402(19)(A), 34 CFR § 300.28(a). It is responsible for providing a free, appropriate public education to all eligible students in the District and for implementing the parental rights and

procedural protections of IDEA.  Defendant receives federal financial assistance and is subject to Section 504 and is a public entity as defined in the ADA, 42 U.S.C. § 12131(1) and the NJLAD, N.J.S.A. § 10:5-5(l).

## III.  JURISDICTION AND VENUE

**10.**      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, conferring jurisdiction in cases arising under the Constitution and laws of the United States, and 28 U.S.C. § 1343, conferring original jurisdiction on district courts to secure relief under any Act of Congress providing for the protection of civil rights.

**11.**      Plaintiffs have exhausted their administrative remedies under 20 U.S.C. § 1415 of the Individuals with Disabilities Education Act ("IDEA").

**12.**      Venue is proper in this district under 28 U.S.C. § 1391.

**13.**      This appeal is timely filed within 90 days of the ALJ's decision, pursuant to IDEA, 20 U.S.C. § 1415(i)(2)(B).

## IV.  FACTS

### A.  PROCEDURAL HISTORY

14.      M.S. and N.S. filed a due process complaint on behalf of R.S. on July 19, 2022, seeking (a) an Order to educate R.S. with students who do not have disabilities to the maximum extent appropriate, i.e., in the regular classroom setting through the use of supplementary aids and services; (b) an Order to revise R.S.'s Individualized Education Program ("IEP") to provide him with the supplementary aids and services that would allow him to be successful in the regular education setting, including training for all staff who work with R.S.; (c) an award of compensatory education for failure to provide R.S. with an IEP that complies with FAPE for 2020-21, 2021-22,

2022-23, and every year thereafter that the District's IEP fails to comply with FAPE; and (d) attorney's fees, expert fees, and costs.

15. The District never filed a responsive pleading.

16. On September 16, 2022, the lower court denied Parents' Motion for Emergent Relief relating to R.S.'s stay-put or pendent placement. As a result, R.S. has been in a self-contained autism classroom for 3 of the 6.5 hour school day since May, 2022.

**B. FAILURE TO PROVIDE FAPE**

17. The District has been providing R.S. with special education through an IEP since he was three years old. For the first three years of school attendance, the District segregated him, placing him a self-contained program for the majority of his school day. Parents consistently asked for inclusion but were repeatedly told he was "not ready."

18. When the parties met in April 2020 to develop an IEP for May 2020 through May 2021, the parties agreed that R.S. would repeat Kindergarten in a regular education classroom for the majority of his school day with supports. In order to be included, the District required R.S. to participate in a self-contained "autism" classroom for 45 minutes of the 6.5-hour school day. Parents did not think that R.S. would benefit from placement in an autism classroom for any period of time, but agreed to move forward as a compromise.

19. Unfortunately, due to the COVID-19 pandemic, R.S. attended school remotely for the entire 2020-21 school year. Parents rearranged their work schedule so that one of them could sit with him while he was remotely working from 8:00 a.m. until 1:15 p.m. every day. Parents worked with R.S. and his special and regular education teachers. R.S. worked on reading, writing, science, social studies and math with his mother by his side, who happens to be a New Jersey licensed psychologist and behaviorist and was able to use appropriate strategies to get R.S. to

attend.  Both the District and Parents reported that R.S. was learning these subjects.  Even so, R.S. was not able to benefit from some of the services remotely, such as physical and occupational therapy sessions, and he did not receive everything called for in his IEP.

20.     In April 2021, the parties met to develop an IEP for R.S. for the 2021-22 school year.  Prior to the meeting, District case manager Julie Kushnir sent Parents a draft of the IEP and as they usually did, Parents promptly responded with their input.

21.     The April 2021 IEP for first grade continued R.S.'s placement in regular education (inclusion) with 45 minutes in a self-contained, autism classroom with supplemental supports and a 1:1 aide.  Unfortunately, because R.S. was not able to be vaccinated, he did not attend school in person in September 2021. Parents requested that virtual instruction continue, but the District refused, and told Parents that R.S. had to come to school or withdraw.  Parents reluctantly withdrew R.S. from September until December 2021 when he could receive his COVID vaccine.

22.     R.S.'s first day back to school in-person was December 23, 2021.  However, his return was fraught with interruptions including winter break (Dec. 23), the District closing due to a COVID outbreak (Jan. 2-Jan.18); and his family's celebration of Lunar New Year (Feb., 1 week). R.S. was not able to adjust like the other students who were in attendance regularly since September 2021.

23.     In February 2022, the District reported that R.S. was having behaviors at school including taking off his socks, shoes, flopping on the floor and touching peers.  District staff was giving him pretzels all day long to attempt to get him to pay attention and comply.

24.     At the same time, District speech and language pathologist noticed that R.S. needed help with communication. She gave him an iPad with pictures on it until such time that a full

augmentative communication evaluation could be finished, noticing that "it would take until June" for R.S. to receive a more appropriate device designed for his unique needs.

25.     On February 17, 2022, Parents gave the District consent to do an AAC evaluation so that he could be provided with an appropriate device.  Parents had previously given consent in 2020 before the pandemic, but the District had never completed the evaluation.

26.     On February 22, 2022, the District invited Parents to a meeting to plan for reevaluations. Parents gave permission for the District to conduct the following additional evaluations: functional behavioral assessment, psychological and a speech and language evaluation.

27.     On March 30, 2022, the District sent Parents an invitation to attend an IEP meeting on April 19, 2022 at 1:30 p.m.   The meeting was to develop an IEP for R.S. for the 2022-23 school year and to review the evaluations.

28.     New Jersey regulations require that Parents receive a copy of the completed evaluations 10 days before the IEP meeting.  N.J.A.C. 6A:14-3.5(a).

29.     Parents did not receive the functional behavior assessment, psychological, or AAC evaluation 10 days prior to the meeting. The District provided them late; (functional behavior assessment given at 2:04 p.m. in the middle of the meeting when the District realized Parents did not get a copy); (psychological given at 11:09 a.m. the day of the meeting); and AAC evaluation (April 22, three days after the meeting).

30.     Parents did not have enough time to read the reports before the meeting in order to fully participate in the development of R.S.'s IEP.

31.     Prior to the IEP meeting on April 19, 2022, Ms. Kushnir planned on how to facilitate the change in R.S.'s placement from regular education for academic subjects (science,

social studies, math and language arts) to a self-contained classroom for almost half of the school day.  She did the following:

   a.  Met with administration to discuss R.S.'s placement, without Parents, because she knew that Parents did not want a self-contained setting;

   b.  Emailed staff to tell them that she had met with administration and was advised that they should "project the program" they felt was most appropriate;

   c.  Drafted an IEP that stated that R.S. would be moved to the self-contained classroom three hours of the six and a half-hour school day, taking him out of the regular education classes for math and language arts.

32.     Ms. Kushnir testified that the District had *already decided*, prior to the IEP meeting, that R.S. should be moved to a more restrictive setting for math and language arts, thus increasing his time in self-contained from 45 minutes per day to 3 hours per day.  She emailed staff indicating that R.S.'s schedule needed to be adjusted in September 2022 prior to the April 2022 IEP meeting.

33.     At the time that the District initiated the change in placement, R.S. had only been back to school less than sixty days after being remotely educated for more than eighteen months.

34.     Ms. Kushnir indicated that the District could have given R.S. "more time to transition" but they were "wasting time" if they did.

35.     The April 19, 2022 IEP meeting lasted one hour, with fifty minutes being taken to review the evaluations.  Parents had ten minutes to discuss their concerns with the change in placement, and were told that if they disagreed, they could "exercise their rights."  The District gave Parents a copy of the then current Parental Rights in Special Education ("PRISE") manual, New Jersey's manual which purports to explain to parents all of their legal rights.

36.     The District did not consider implementing the individualized behavior plan, providing him with the appropriate AAC device, or  consulting with an expert on inclusive education before moving him to a more restrictive setting.

37.     The very next day after the IEP meeting, Parents provided written feedback to the IEP team and requested that R.S. remain in regular education with supports.  Parents also asked that the District consult with an inclusive education specialist to provide suggestions and supports to teachers on how to include R.S.

38.     One such consultant that the District *could* have engaged is the New Jersey Coalition on Inclusive Education which regularly works in conjunction with New Jersey's Department of Education.  *See* www.njcie.org.  The New Jersey Coalition on Inclusion offers, among other things:

     a.  Professional development trainings for teachers, paraprofessionals, and related service providers on how to successfully include and support children with disabilities in a regular education classroom;

     b.  Consulting and coaching services to show school districts and personnel to develop a multi-tiered intervention network to allow all students to be included and advance in the regular education setting.

39.     The New Jersey Coalition for Inclusive Education is a non-profit organization which has provided consulting services for 25 years to districts in New Jersey to help support inclusion.

40.     The District refused to consider engaging the Coalition or any other expert in inclusive practices or provide support for the teachers to allow R.S. to be included.

41.    Parents engaged two inclusive education specialists: Dr. Chelsea Tracy-Bronson and Dr. Kathleen Whitbread, in order to provide the District with the support they needed to include R.S.  Both experts visited R.S. at school, spoke with Parents and teachers, and provided written reports with suggestions, agreeing overwhelmingly that R.S. could be included.

42.    The District did not provide any of R.S.'s teachers with either Dr. Tracy-Bronson's or Dr. Whitbread's written report and recommendations.

43.    None of R.S.'s teachers have been provided with specific and adequate training on inclusive education practices and how to implement these strategies.

44.    None of R.S.'s teachers were provided with appropriate support on how to systematically modify R.S.'s curriculum so that he could be effectively included.

45.    The District does not strive to include all children with disabilities in regular education.  It maintains separate classes and indicates that children can be moved to regular education when they are "ready."  In the past, the District offered Parents placement for R.S. in another school within the District which services only children with Down syndrome.  Parents declined as they always wanted R.S. to be included in a regular class with peers in his home school.

46.    Parents have even offered to pay for a consultant to work with the R.S. and his team if the District would include him. The District has refused.

47.    R.S. is the first student with Down syndrome that several of his teachers have taught.  R.S. is the only student with Down syndrome that is currently being included in the science and social studies inclusion classes he attends.

48.    On May 6, 2022, Ms. Kushnir emailed Parents and indicated that they could review the most recent draft of R.S.'s IEP through a venue called the "collaboration portal."  This was the

first time the District sent a document through this method, and Ms. Kushnir failed to provide instructions to Parents on how to access it.

49.     On May 17, 2022, Ms. Kushner followed up with Parents by emailing them a copy of the "draft" IEP.   Parents saw only then that the District had not honored their request to keep R.S. in inclusion but were still proposing that he be secluded for three hours of a six and a half hour school day.

50.     On May 21, 2022, the District implemented the draft IEP and moved R.S. to the self-contained classroom for math and language arts, increasing his time in seclusion.  The District did not tell Parents they moved R.S. on this day.

51.     On May 25, 2022, Parents again wrote to the District to request that R.S. remain in regular education for the majority of the day.

52.     On June 3, 2022, Ms. Kushnir wrote to Parents and told them that the District had already implemented the draft IEP and changed R.S.'s placement.  The reasons given for the exclusion from regular education were:

> Based on all reports, classroom observations and data collected, we continue to strongly recommend for R.S. to participate in the program that supports him academically, socially, and emotionally.  It is crucial to teach R.S. skills and then help him generalize it in the mainstream setting.  The proposed program represents he least restrictive environment to meet R.S.'s needs.

53.     On June 6, 2022, Parents requested another IEP meeting to discuss R.S.'s placement, which the District reluctantly scheduled on June 14, 2022.  Prior to the meeting, Ms. Kushnir emailed members of the team indicating that they were not going to change R.S.'s placement.  At the meeting, Parents tried to engage in a collaborative discussion to ask that R.S. be given supports in a regular education setting, but the District told them it was "too late."  The entire meeting lasted 15-20 minutes.

54.     Since May 2022, R.S. has been in a self-contained classroom for 3 hours of 6.5-hour school day, i.e., the time allotted for language arts and math.

55.     The IEP for 2022-23 dated April 19, 2022 had no academic goals for reading, writing, science, social studies or math.  Ms. Kushnir testified that R.S.'s functioning was "too low" for the IEP to contain any academic goals.  R.S.'s previous IEP, for 2021-22, and subsequent IEP, for 2023-24, contain academic goals.

### C.  PETITION FOR DUE PROCESS AND REQUEST FOR PENDENCY

56.     On July 19, 2022, Parents filed a complaint for due process seeking that R.S. be included in the regular education.  Parents requested that District staff be provided with teacher training, a supplementary service that school districts must provide when necessary to educate students with disabilities in regular classes. Parents requested professional development in at least the following areas:

    a.  Understanding the difference between accommodations and modifications and when each should be used;

    b.  Designing accommodations, modifications and special instruction, etc. that can be delivered in the regular education setting in order to facilitate the student's access to and progress in the general education curriculum;

    c.  Modifying the general education report cards to give a meaningful reflection of the student's progress in the general education curriculum;

    d.  Scaffolding, differentiation, flexible grouping, universal design for learning, collaborative teamwork among general and special educators and other methods of fostering whole-class support;

e.  Making appropriate decisions to assure placement in the LRE for students with significant disabilities;

f.  Understanding that students with significant disabilities do not need to be "ready" for inclusion and that they do not need to master the same content as students without disabilities to be educated successfully in general education classes.

57.  The IDEA states that a student with a disability "shall remain in his current educational placement during the pendency of any administrative or judicial proceeding resulting from a due process complaint unless the parent and the district agree otherwise." 34 C.F.R. § 300.518(a).

58.  Under IDEA and New Jersey regulations, R.S. was entitled during the pendency of the due process hearing to "stay-put" in his current educational placement.  20 U.S.C. § 1415(j) and 34 C.F.R. § 300.518, N.J.A.C. 6A:14-2.7(u).

59.  Stay-put is the agreed upon placement *last reached* by the parties.  Thus, a "court does not define a student's educational placement when it issues a stay-put order.  Instead, a student's current pendency placement is the education placement in the student's last agreed-upon IEP." *Simpson-Vlach v. Mich. Dep't of Educ.*, 2023 U.S. App. LEXIS 11542 at *13-14 (6th Cir. May 10, 2023)(citing 20 U.S.C. § 1415(j); *N.W. ex. rel. J.W. v. Boone Cnty. Bd. of Educ.*, 763 F.3d 611, 617-18 (6th Cir. 2014)).

60.  Under federal law and the New Jersey Code, there is no limitation on the application of IDEA's stay-put provision to due process complaints filed after 15 calendar days of the proposed change in the child's program or placement.

61.     New Jersey's Administrative Code contains a provision, N.J.A.C. 6A:14-2.3(h), that states that a district may implement a change in a student's placement fifteen days after parents receive written notice.

62.     Parents never received appropriate written notice as they received documents that were labelled "draft," leading them to believe the parties were still discussing the proposed change collaboratively.  A draft IEP does not satisfy the written notice requirements that would allow a district to implement an IEP after 15 days.  *M.L. v. Beverly City Board of Educ.*, 2007 N.J. Agency LEXIS 622 (Sept. 6, 2007).

63.     The District took it upon themselves to move R.S. 15 days after it issued the draft IEP on May 6, 2022 without telling Parents this would happen despite their objections.  Parents learned that R.S.'s classroom was moved later.

64.      New Jersey's Parental Rights in Special Education Handbook, ("PRISE"), once contained a provision that explained that a parent who disagrees with a child's placement pending the outcome of a due process proceeding had only 15 days to file for due process in order to preserve that child's right to stay-put.

65.      On May 6, 2019, the United States Department of Education issued a corrective action notice to the New Jersey Department of Education to instruct it to remove any references in the PRISE manual to limitations on stay-put complaints filed within 15 days of the proposed change to a child's program because such limitations were inconsistent with IDEA which poses no such deadline.[1]

66.     The USDOE corrective action notice stated:

---

[1] The USDOE's findings may be found on the NJDOE's web site at:
https://www.nj.gov/education/specialed/policy/disputeresolution/Files%20(docs%20and%20images)/NJ-B-RDAOnsiteVisitCoverLetter.pdf.  The determination regarding stay-put begins on page 4 of the latter document.

While neither the IDEA or its implementing regulations define "current educational placement," IDEA presumes that he student's current educational placement is the last agreed-upon placement where the student must remain until the resolution of the dispute. A student's right to "stay put" is ensured regardless of when the student's parent/guardian files a request for a due process hearing. **A student's right to "stay-put" applies even if the filing occurs more than 15 calendar days after the proposed change in the student's program or placement." (emphasis in original).** *Id.*

67.     In response to the corrective action notice, all reference to limiting a student's right to "stay-put" protections for filings that occur within 15 calendar days of the proposed change in the student's placement have been removed from New Jersey's PRISE booklet and have been removed from all documents issued by/published by the NJDOE.

68.     In further response to the USDOE's non-compliance findings, NJDOE issued this memorandum, also found on NJDOE's website, that reiterates "**A student's right to stay put" applies even if the filing occurs more than fifteen calendar days after the proposed change in the student's program or placement."** That memorandum also states: "prior references to limiting a student's right to "stay put" protections have been removed from the Parental Rights in Special Education (PRISE) booklet. . ."[2]

69.     Petitioners would not have learned by reading PRISE that the District could change R.S.'s placement if they did not file within 15 days of proposing a draft IEP.

70.      On August 31, 2022, Parents requested that the Office of Administrative Law issue an Order that R.S.'s last agreed upon placement, i.e., in regular education for the entirety of the school day except 45 minutes, be honored and that his stay put be enforced as required under IDEA.

---

[2]*See Revised Procedures for Determining a Student's Status During a Special Education Due Process Hearing* (emphasis in original), found at:
https://www.nj.gov/education/specialed/policy/disputeresolution/Files%20(docs%20and%20images)/DeterminingStudentsStatusDueProcessHearing.pdf.

71.     In an Order dated September 16, 2022, Administrative Law Judge Dean Buono denied R.S.'s right to remain in the last agreed upon placement, stating the reason was that the "Petitioners failed to challenge the proposed IEP until July 19, 2022, nearly three months later" than when it was issued, i.e., April 21, 2022." He stated that "in order to delay the implementation of a proposed action, a parent must file a request for mediation or a due process hearing prior to the expiration of the fifteenth calendar day following written notice of the proposal."

72.     The ALJ erred in that there is no 15-day limitation on the right to stay-put or a pendent placement in federal or state law.

73.     The ALJ committed reversible error in that New Jersey cannot impose a restriction on the right to stay-put that takes away or lessens a student's federally protected rights under IDEA.

74.     The ALJ committed reversible error in that his ruling gives students with disabilities less rights, not more, than what IDEA provides. As the result of the ALJ's reversible error, R.S. was not provided with the protections afforded under IDEA of pendency.

75.     The ALJ committed reversible error in that the agreed upon placement last reached by the parties was regular education, not the April 2021 IEP placing R.S. in an autism classroom for 3 of a 6.5 hour school day.

76.     R.S. was further harmed in that the PRISE manual provided to Parents contains no such mention that in order to protect their rights to pendency and stay-put, they must file for due process within 15 days. Parents were not aware of this arbitrary rule that restricts their child's protections under IDEA.

### D. The DUE PROCESS HEARING

77.     At the hearing, Parents presented testimony from two experts, Dr. Chelsea Tracy-Bronson and Dr. Kathleen Whitbread, both of whom opined that R.S. could be included if teachers in the District are provided with support and training on how to do it effectively.

78.     Dr. Kathleen Whitbread is a special education professor and nationally recognized expert on successful inclusion of children with Down syndrome.   Dr. Whitbread has worked with hundreds of children with Down syndrome, teaching them how to read systematically for more than forty years.   In addition to many other qualifications, she was the director of a technical assistance project in Connecticut where teachers state-wide were trained and supported to include children with Down syndrome in regular education after a lawsuit required the state to do more to fully comply with IDEA's goal of fully including all children.

79.     Dr. Whitbread was admitted, without objection, as an expert in the area of special education, education of children with intellectual disabilities, education of children with Down syndrome, strategies for educating them in regular education classes, and literacy instruction of children with disabilities.

80.     Dr. Whitbread testified that R.S. is absolutely typical of the very type of student she has worked with for many years and that there is no legitimate reason why he cannot be included.  **She stated: "I have no doubt. . . that with the training his teachers would be very able to deliver his education in a general education classroom."**

81.     She explained that R.S. could be included if provided with supplemental supports including training of the teachers and staff on how to include R.S.  In her vast experience, she has encountered many teachers who think inclusion is "too hard" or that a student is "not ready," but after receiving the support she provides to public school staff they change their minds because this

belief is an antiquated myth.  She explained that by using a systematic field of research-based differentiated instruction R.S. could be included and receive a greater academic and social benefit from inclusion.

82.     Dr. Chelsea Tracy-Bronson is an educator of teachers, author and professor who specializes in showing school district personnel how to include students with disabilities.  She consults with districts throughout New Jersey and has even been hired by East Brunswick.  She has extensive experience in working with children with Down syndrome.

83.     Dr. Tracy-Bronson was admitted, without objection, as an expert in the area of special education, education of children with disabilities, education of children with Down syndrome and strategies for including them in general education classes.

84.     She provided a written report and testimony explaining that if R.S.'s teachers were provided with appropriate support and professional development, they could learn how to adapt their lessons for R.S. to be included – which she stated was entirely possible for R.S.  With allotted time for planning in advance, R.S. could be provided with a part of the lesson given in regular education, which would allow him to receive a greater benefit, both educationally and socially, than being isolated.

85.     The District presented no expert witnesses.

86.     The ALJ ruled in favor of the District and dismissed R.S.'s complaint. She stated that R.S. was provided with a FAPE in the LRE.

87.     The ALJ committed errors of law and abused her discretion as described below.

88.     The ALJ stated that "the extensive testimony from the District's witnesses clearly demonstrated that the change in R.S.'s IEP was mandated in language arts and math as the efforts to educate him in the general education setting with supports and a one to one aid were not

enough." The ALJ did not address the issue of whether with additional supports, R.S. could be included.

89.    The ALJ provided no factual support to explain why the change in R.S.'s IEP to a more restrictive placement was "mandated." She did not opine as to why she did not consider Drs. Whitbread or Tracy-Bronson's testimony that R.S. could be included.

90.    The ALJ failed to acknowledge that IDEA mandates that removal of a child with disabilities from regular education may *only* be undertaken when education in such a setting cannot be achieved satisfactorily.

91.    The ALJ did not analyze the factors set forth in *Oberti* including examining whether (a) the District had made reasonable efforts to educate R.S. with supplementary aids and services; (b) evaluated the benefits of including R.S. in the regular classroom with supplementary aids and services against the benefits R.S. would receive in the special education classroom; (c) consider the detriment to the other children in the regular classroom to including R.S. *Oberti*, 995 F.2d 1204, 1216-17.

92.    The ALJ stated that Parents' experts did not "discredit any of the testimony of the districts' witnesses who credibly demonstrated that R.S. was being provided FAPE in the LRE and was making meaningful progress in the self-contained classroom for math and language arts." Decision at 9-10. However, the ALJ misstates the purpose of the expert testimony. The question is *whether R.S. could be appropriately educated* in the regular education classroom with supplemental supports and services – *not* whether or not the experts discredited the teachers. The expert testimony showed that this was entirely achievable for R.S. Currently his teachers, while well-meaning, do not have the supports and training they need to be able to fully comply with IDEA's mandate of inclusion. Thus, the purpose of the expert testimony was not to discredit

teachers, but to show that R.S. could be reasonably be included in regular education as required under IDEA and *Oberti*.

93.    The ALJ made several factual mistakes as well, including:

    a.   She stated that Dr. Chelsea Tracy-Bronson did not review R.S.'s records other than his IEP; Dr. Tracy-Bronson *did* review R.S.'s most recent evaluations in formulating her opinion.

    b.   She stated that Dr. Whitbread offered recommendations for literacy and math programs that could be beneficial to R.S. and stated that she "did not opine as to why these could not be incorporated into the inclusion classroom or as to why these would not be effective in the inclusion classroom." Dr. Whitbread, to the contrary, *did* state that these programs could be implemented in a regular education classroom.

    c.   She stated that the reason that Parents wanted inclusion was because they were mostly concerned about R.S.'s social interaction with peers. This is untrue as Parents requested inclusion because it is his legal right and R.S. will benefit more educationally and socially from that setting.

## V.  CLAIMS

**COUNT I**
**IDEA**
**U.S.C.A. §1400, *et seq.***

94.    Plaintiffs repeat each paragraph above as if set forth at length herein.

95.    The purpose of the IDEA is to "ensure that all children have available to them a free appropriate education that emphasizes special education and related services to meet their unique needs." 20 U.S.C. §1400(d)(1)(A).

96.     **Predetermination.** Both procedurally and substantively, the District denied Plaintiffs appropriate and meaningful participation by adhering to stereotypes and beliefs that no supports would enable R.S. to be successful in regular education.

97.     **Parental Participation Denial.** Additionally, the District denied meaningful participation when they decided *before* the IEP meeting that R.S. would be moved to a more restrictive placement and when they did not give Parents sufficient time to review all of the completed evaluations at least 10 days prior to the meeting.

98.     **Failure to Appropriately Train Personnel.** The District failed to appropriately train its personnel about the delivery of supports in regular education first. It failed to provide training and support for personnel on how to deliver "supplementary aids and services, program modifications or supports," to include R.S. as required under the law. 34 C.F.R. § 300.346(d)(2).

99.     **Failure to Develop an Appropriate IEP to deliver FAPE.** To receive a free appropriate education, R.S. is legally entitled to appropriately ambitious goals in light of his unique circumstances and the provision of the necessary supports and services to

100.    The District's failure to include academic goals in R.S.'s IEP coupled with the denial of necessary support and service inhibits R.S.'s education and denies him FAPE. The ALJ failed to consider the sufficiency of the IEP and lack of academic goals in the IEP.

101.    **LRE Denial.** Congress and the United States Supreme Court have required inclusion in regular classes to the "maximum extent appropriate," and "separate classes" cannot be explored *until* supplementary aids and services are *first* tried in the regular education classroom:

> To the maximum extent appropriate, children with disabilities. . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. §

1412(a)(5)(A); *Bd. of Educ. v. Rowley*, 102 U.S. 176, n. 24 (1982), 34 C.F.R. § 300.114(a)(2)(ii).

102.     As the IDEA says, "supplementary services" are to be "provided **in conjunction with regular class placement.**" *Id.* at § 300.115(b)(2).

103.     There is no dispute that the change of placement was ordered without first providing R.S. with the recommended AAC device, the BIP, and training for the teachers on how to include R.S.

104.     The simple, straightforward application of IDEA's least restrictive environment statute shows that it is impossible for the District to have complied with the IDEA.  42 U.S.C. 1412(5).  There is no dispute that the District demanded "special classes, separate schooling, or other removal of a handicapped child from the regular education environment."  It put R.S. in a classroom populated by children with disabilities for 3 of a 6.5 hour school day.

105.     The question is whether supplemental aids and services can be delivered in the regular education classroom.  If they can, they must.  *Roncker on behalf of Roncker v. Walker,* 700 F.2d 1058, 1063 (6th Cir. 1983).

106.     The ALJ committed reversible error by not considering the feasibility of providing the necessary supports in regular education.

107.     The District violated R.S.'s rights secured by IDEA, 20 U.S.C. § 1400, *et seq.* and 34 C.F.R. part 300 by:

(a)  Denying R.S. a FAPE in violation of 20 U.S.C. §§1412(a)(1)(A) and 1414(d);

(b)  Failing to provide R.S. with an IEP that provided a program and placement that is FAPE in LRE;

(c) Predetermining R.S.'s educational placement, in violation of Parents' right to participate in educational decision-making for their son, with the result that R.S. has been denied educational benefit.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

108.    Plaintiffs repeat each paragraph above as if set forth at length herein.

109.    As the Supreme Court has recognized, "[t]he same conduct might violate all three statutes – which is why a plaintiff might seek relief for the denial of FAPE under Title II and Section 504 as well as the IDEA." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 171 (2017).

110.    Plaintiffs seek relief for the denial of least restrictive environment under all three laws given that Down syndrome, being an intellectual disability, which affects the major life activity of "learning," clothes R.S. with coverage under these additional laws.

111.    The purpose of Section 504 is to "empower individuals with disabilities to maximize . . . **inclusion and integration** into society." 29 U.S.C. § 701(b)(1) (emphasis added.)

112.    Section 504 of the Rehabilitation Act bars all federally funded entities from discriminating on the basis of disability.  *See* 29 U.S.C. § 794.  In relevant part, Section 504 states that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

113.    The regulations implementing Section 504 adopt language from IDEA, requiring that schools "shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction.  34 C.F.R. § 104.33(a).

114.    Like IDEA, Section 504 also has a least restrictive environment provision:

A recipient to which this subpart applies shall educate, or shall provide for the education of, each qualified handicapped person in its jurisdiction *with persons who are not handicapped to the maximum extent appropriate to meet the needs of the handicapped person.* A recipient shall place a handicapped person in the regular educational environment operated by the recipient *unless it is demonstrated by the recipient that the education of the person in the regular environment with the use of supplementary aids and services cannot be achieved satisfactorily.* Whenever a recipient places a person in a setting other that the regular educational environment pursuant to this paragraph, it shall take into account the proximity of the alternate setting to the person's home.

34 C.F.R. § 104.34(a) (emphasis added).

115. Because these same least restrictive goals are found in the IDEA, "it is clear why violations of Part B of the IDEA are almost always violations of the [Rehabilitation Act] . . . . When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates the RA because it is denying a disabled child a guaranteed education merely because of the child's disability." *Andrew M. v. Del. Cty. Office of Mental Health & Mental Retardation,* 490 F. 3d 337, 350 (3d Cir. 2007).

116. The District violated Section 504, 29 U.S.C. § 794 and 34 C.F.R. § 104.4 by:

(a) denying R.S. the opportunity to participate in and benefit from federally assisted education services, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(i);

(b) affording R.S. an opportunity to participate in or benefit from public education that is not equal to those afforded others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(ii);

(c) providing R.S. with public education that is not as effective as that provided to others, in violation of 29 U.S.C. § 794(a) and 34 C.F.R. § 104.4(b)(1)(iii);

(d) limiting R.S.'s enjoyment of the right and opportunity to receive a public education, in violation of 34 C.F.R. § 104.4(b)(1)(vii).

117.    By failing to provide reasonable accommodations, including services proven by research and prior demonstrated efficacy to be effective to meet R.S.'s unique needs, District personnel acted with deliberate indifference to R.S.'s federally protected rights.

## COUNT III
## TITLE II OF THE ADA, 42 U.S.C. § 12132

118.    Plaintiffs repeat each paragraph above as if set forth at length herein.

119.    Title II of the ADA is similar to Section 504 but extends the nondiscrimination rule of Section 504 to services provided by "any public entity," without regard to whether the entity is the recipient of public funds.  42 U.S.C. § 12132.

120.    Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132.  Title II further prohibits the unnecessary segregation of persons with disabilities. *See id.; Olmstead v. L.C.,* 527 U.S. 581, 600 (1999).

121.    As Congress stated in the findings and purpose section of the ADA, "[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 US.C. § 12101(a)(2).

122.    Like the Rehabilitation Act, Title II also contains a least restrictive environment provision.  Specifically, Congress directed the Attorney General to issue regulations implementing Title II of the ADA.  *See* 42 U.S.C. § 12134.  These regulations require public entities to "administer services, programs, and activities *in the most integrated setting appropriate* to the

needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (emphasis added).  Like the IDEA, "[t]he most integrated setting" means a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible …."  *See id.* pt. 35, app. B at 690. Title II's regulations further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination, including unnecessary segregation.  *Id. at* § 35.130(b)(3).

123.    The Supreme Court has held that Title II prohibits the unjustified segregation of individuals with disabilities in the provision of public services.  *See Olmstead,* 527 U.S. at 597. Unjustified isolation of persons with disabilities is unlawful discrimination because (1) segregation "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and (2) segregation "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.* at 600-01.

124.    Further, Title II of the ADA requires Defendant to provide reasonable modifications to its policies, practices, or procedures when necessary to avoid discrimination. 28 C.F.R. § 35.130(b)(7).

125.    Before segregating R.S. to a more restrictive setting, the District failed to reasonably modify its policies, practices, or procedures to enable R.S. to attend the regular education classroom with reasonable accommodations/modifications.  Failing to provide R.S. with these reasonable accommodations/modifications resulted in discrimination against R.S. by denying him continued access to the regular education classroom in violation of Title II of the ADA.

126.    The District intentionally and purposefully violated R.S.'s rights secured by the ADA, 42 U.S.C. § 12132, *et seq.* and 28 C.F.R. § 35.130 by:

(a) subjecting R.S. to discrimination, in violation of 28 C.F.R. § 35.130(a);

(b) excluding R.S. from participating in and denying him the benefit of District services, programs, and activities on this basis of his disability, in violation of 28 C.F.R. § 35.130(b)(1)(i);

(c) denying R.S. the opportunity to participate in and benefit from aids, benefits and services on a basis equal with those afforded others, in violation of 28 C.F.R. § 35.130(b)(1)(ii);

(d) refusing to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination against R.S., in violation of 28 C.F.R. § 35.130(b)(7);

(e) limiting R.S. in the enjoyment of rights, privileges, advantages, or opportunities enjoyed by others receiving the aid, benefit, or service, in violation of 28 C.F.R. § 35.130(b)(1)(vii).

## COUNT IV
## NJLAD, N.J.S.A. § 10:1-2

127.    Plaintiffs repeat each paragraph above as if set forth at length herein.

128.    By virtue of the actions set forth above, the District has violated R.S.'s rights secured by the NJLAD.

**WHEREFORE**, Parents respectfully request that this Court:

(1)    Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendant denied R.S. the necessary supports and services, including behavioral supports, teacher training, and an AAC device;

28

(2)     Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that the District IEP failed to provide R.S. with FAPE in the least restrictive environment for the 2022-23 school year and every year thereafter that R.S. remains in the self-contained autism classroom instead of regular education;

(3)     Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, that Defendant's attempts to place R.S. in a segregated, self-contained classroom were unjustified and unlawful under Section 504 and Title II of the ADA;

(4)     Enter an Order that R.S. and other students in New Jersey do not have to file within 15 days of written notice of a change of placement in order to access their right to pendency under IDEA;

(5)     Award preliminary and permanent injunctions ordering Defendant to return R.S. to his placement in regular education, with the behavior plan, AAC device, and professional development training for the staff to appropriately learn how to include R.S. and this be his stay-put placement;

(6)     Award compensatory education, reimbursement for attorney's fees and expenses, for harm suffered as a result of the Defendant's actions;

(7)     Vacate the decisions of the ALJs;

(8)     Enter judgment for the Parents and against the Defendant;

(9)     Grant any other relief the Court deems appropriate.


Dated: October 18, 2023                    Respectfully submitted,

                                           REISMAN CAROLLA GRAN & ZUBA LLP

                                           *s/ Amelia Carolla*
                                           Amelia Carolla
                                           19 Chestnut Street
                                           Haddonfield, NJ 08033
                                           t 856.354.0021
                                           f 856.873.5640
                                           amy@rcglawoffices.com