**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| R.S., *by and through his parents, M.S. and N.S.*, M.S., and N.S., <br><br> Plaintiffs, <br><br> v. <br><br> EAST BRUNSWICK SCHOOL DISTRICT, <br> Defendant. | Civil Action No. 23-21258 (MAS) (JTQ) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon R.S., *by and through his parents*, *M.S. and N.S.*, M.S., and N.S.'s, ("Plaintiffs") Motion for Summary Judgment. (ECF No. 19.) East Brunswick School District (the "District") responded (ECF No. 24), and Plaintiffs replied (ECF No. 25). The Court has carefully considered the parties' submissions and reaches its decision without oral argument under Local Civil Rule 78.1(b). For the reasons below, Plaintiffs' Motion is denied in its entirety.

I.    **BACKGROUND**

A.    **Overview of Individuals with Disabilities Act**

The Individuals with Disabilities Act ("IDEA") allows states to access federal funds for the education of disabled children. *See* 20 U.S.C. §§ 1400, *et seq*.; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d Cir. 2014). As a condition of receipt, states must ensure disabled children within their borders receive a free appropriate public education ("FAPE"). 20 U.S.C.

§§ 1412(a), 1413(a); *see also Blunt*, 767 F.3d at 267-68. If a child is deemed to have a disability, then a state satisfies its duty to provide a FAPE by providing an [Individualized Education Program ('IEP')], which is 'an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances.'" *J.M. v. Summit City Bd. of Educ.*, No. 19-159, 2020 WL 6281719, at *1 (D.N.J. Oct. 27, 2020) (citing *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403 (2017)), *aff'd*, 39 F.4th 126 (3d Cir. 2022). Generally, an IEP is a written statement, "developed, reviewed, and revised by the IEP Team—a group of school officials and the parents of the student—that spells out how a school will meet an individual disabled student's educational needs." *Y.B. v. Howell Twp. Bd. of Educ.*, 4 F.4th 196, 198 (3d Cir. 2021) (quotation marks omitted) (quoting 20 U.S.C. § 1414(d)(1)(A), (B)). "[A]n IEP describes a child's 'present levels of academic achievement,' offers 'measurable annual goals' to 'enable the child to . . . make progress in the general educational curriculum,' and describes 'supplementary aids and services . . . provided to the child' to meet those goals." *Id.* (quoting 20 U.S.C. § 1414(d)(1)(A)(i)(I), (II)(aa), (IV)).

The educational benefit conferred to the student through the IEP must be "meaningful," *Polk v. Cent. Susquehanna Intermediate Unit 16*, 853 F.2d 171, 180 (3d Cir. 1988), meaning "more than a trivial educational benefit" in light of the student's "individual abilities," *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 269 (3d Cir. 2012). Once the IEP is put in place, the school district must implement the IEP in the least restrictive environment ("LRE"). *See* 20 U.S.C. § 1412(a)(5) ("To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services

2

cannot be achieved satisfactorily."). "If parents are dissatisfied with the district's determinations or IEP, they may bring a challenge in a state administrative process and then seek review in court." *J.M.*, 2020 WL 6281719, at *1 (citing *Cape Henlopen Sch. Dist.*, 606 F.3d 59, 66-67 (3d Cir. 2010)).

## B.    Factual Background

Plaintiffs are the parents of R.S., a minor child who was diagnosed with Down Syndrome and an expressive-receptive language disorder. (*See* Pls.' Statement of Undisputed Material Facts ("PSUMF") ¶ 1, ECF No. 19-2; Def.'s Statement of Facts ("DSF") ¶ 1, ECF No. 24-1; ALJ Op. 2, ECF No. 18.) R.S. lives in the District and recently completed the second grade. (PSUMF ¶ 1; DSF ¶ 1; ALJ Op. 2, 10.) Beginning at age three, R.S. has received from the District special education services through IEPs. (PSUMF ¶ 4; DSF ¶ 4.) The District issues IEPs in May of each school year. (PSUMF ¶ 8; DSF ¶ 8.) During R.S.'s first three years attending classes in the District, pursuant to his IEP, he spent the entirety of each school day in self-contained special education classrooms. (PSUMF ¶ 5; DSF ¶ 5.)

During the 2019-2020 school year, R.S. began as a kindergartener in the District as part of the Learning and Language Disabled Program. (ALJ Op. 10.) In preparation for the 2020-2021 school year, the District held a meeting in April 2020 with N.S. and M.S., R.S.'s parents, and consultants hired by N.S. and M.S. (PSUMF ¶ 8; DSF ¶ 8.) This meeting resulted in an IEP that ran from May 7, 2020 through May 6, 2021. (PSUMF ¶ 9; DSF ¶ 9.) The IEP called for R.S. to repeat kindergarten in the District for the 2020-2021 school year in an in-class resource room for nearly the entirety of the school day. (PSUMF ¶ 9; DSF ¶ 9; ALJ Op. 10.) He would leave class for speech, occupational, and physical therapy and have a one-on-one aide. (ALJ Op. 10.) The IEP,

additionally, required that R.S. be in an autism classroom for forty-five minutes of the day. (PSUMF ¶ 9; DSF ¶ 9.)

During the 2020-2021 school year, R.S. attended school virtually because of the COVID-19 pandemic. (PSUMF ¶ 14; DSF ¶ 14; ALJ Op. 10.) Despite attending remotely, special education teacher Stephanie Mischik ("Mischik") worked with R.S.[1] (PSUMF ¶ 15; DSF ¶ 15.) In preparation for the 2021-2022 school year, the parties met again in April 2021 to develop an IEP for R.S. (PSUMF ¶ 22; DSF ¶ 22.) The District's IEP for the 2021-2022 school year continued R.S.'s placement in an inclusion, in-class resource setting for the entirety of the school day, except for forty-five minutes during which he would be in an autism self-contained classroom. (PSUMF ¶ 26; DSF ¶ 26.)

During the 2021-2022 school year, R.S. returned to in-person instruction in December 2021.[2] (PSUMF ¶ 34; DSF ¶ 34; ALJ Op. 10.) The District, however, briefly shifted to remote schooling due to a COVID outbreak, and following the time for holiday celebrations, R.S. returned to school permanently in January 2022. (PSUMF ¶ 35; DSF ¶ 35.) Following his return, R.S. had difficulty adjusting to in-person instruction. (PSUMF ¶¶ 36-39; DSF ¶¶ 36-39; ALJ Op. 10.) In February 2022, the District met with R.S.'s parents, and they consented to an Augmentative and

---

[1] At first, R.S. had trouble adjusting to remote learning. (PSUMF ¶¶ 17-18; DSF ¶ 18.) But, Mischik would modify activities for R.S., providing questions that helped keep R.S. interested in learning. (PSUMF ¶ 18; DSF ¶ 18.) Nonetheless, like many other students, R.S. was not able to fully benefit from all the services he should have received during COVID, such as his remote physical and occupational therapy sessions. (PSUMF ¶ 20; DSF ¶ 20.)

[2] Plaintiffs wanted R.S. to attend first grade in September 2021 in-person, but because he was not yet eligible to receive the COVID vaccine, he was not able to safely attend school. (PSUMF ¶ 29; DSF ¶ 29.) Plaintiffs requested that virtual instruction continue, but the District told Plaintiffs that they had to send R.S. to school in-person or withdraw him altogether. (PSUMF ¶ 29; DSF ¶ 29.) Not wanting to jeopardize R.S.'s health, Plaintiffs did their best to educate him from September until December 20, 2021 on their own and then re-registered him as soon as he was fully vaccinated. (PSUMF ¶ 30.)

Alternative Communication ("AAC") evaluation, a functional behavioral assessment, a psychological assessment, and a speech and language assessment. (PSUMF ¶¶ 45-47; DSF ¶¶ 45-47; *see* ALJ Op. 10.) Following these assessments, R.S.'s parents met again with the District to discuss R.S.'s IEP. (PSUMF ¶¶ 52, 54; DSF ¶¶ 52, 54; ALJ Op. 10.) On April 19, 2022, the District held an IEP meeting, which reflected a modified IEP that moved R.S. to a self-contained autism classroom for language arts and math. (PSUMF ¶ 57; DSF ¶ 57; ALJ Op. 10.) On May 4, 2022, the IEP took effect, and in June 2022, R.S. was moved to the self-contained autism classroom for language arts and math. (ALJ Op. 10.) After Plaintiffs learned that R.S. had been moved to the self-contained classroom, they requested another IEP meeting. (PSUMF ¶ 85; DSF ¶ 85.) On June 14, 2022, Plaintiffs met for another IEP meeting and asked the District to reconsider its decision to move R.S. to an autism, self-contained classroom. (PSUMF ¶ 87; DSF ¶ 87.) The District refused. (PSUMF ¶ 87; DSF ¶ 87.)

On July 19, 2022, Plaintiffs filed a complaint under IDEA regarding R.S.'s placement with the Office of Special Education Programs. (ALJ Op. 2.) Plaintiffs filed a motion for stay put, but it was denied because it was untimely. (*Id.*) The complaint was then transferred to the Office of Administrative Law and assigned to an Administrative Law Judge ("ALJ").[3] (*Id.*) Plaintiffs' petition eventually proceeded to a hearing, which took place remotely in front of an ALJ on several dates between March 20 and June 1, 2023. (ALJ Op. 2.) The record was closed following submissions from the parties on July 25, 2023, and a telephone conference to address a discrepancy in the record on August 17, 2023. (*Id.*) The ALJ issued a decision on August 22, 2023. (*Id.* at 13.)

---

[3] Following the previous ALJ's appointment to the Superior Court, the matter came before the current ALJ, from which this appeal is taken. (ALJ Op. 2.) A final decision in the District's favor was entered on August 22, 2023. (*Id.* at 12-13.)

C.    **The ALJ's Decision**

The ALJ found in favor of the District in determining whether R.S. was being provided with a FAPE in the LRE. (ALJ Op. 12.) The ALJ first considered the testimony from seven witnesses for the District: Julia Kushnir ("Kushnir"), Sherry Miller ("Miller"), Mischik, Andrea Bianco-Stampfel ("Bianco-Stampfel"), Emily Schweiderek ("Schweiderek"), Ariella Fekete ("Fekete"), and Rupa Nadkar ("Nadkar"). (*Id.* at 3-7.) The ALJ then considered Plaintiffs' three witnesses: Chelsea Tracy-Bronson ("Tracy-Bronson"), Kathleen Whitbread ("Whitbread"), and N.S. (*Id.* at 7-8).

1.    *Kushnir Testimony*

Kushnir works as a case manager for the District. (*Id.* at 3.) Kushnir testified that she was familiar with R.S.'s case, particularly his difficulties after returning to the classroom in 2021 and the reevaluation, which resulted in his being moved to a self-contained autism classroom for math and language arts. (*Id.*) Kushnir also testified that she was aware his parents were concerned about peer interaction but noted that she observed him in the self-contained classroom and found he was more engaged than in a general education classroom. (*Id.*) Following the re-evaluation of R.S.'s IEP, Kushnir agreed with the updated plan, noting that even in a general education setting, R.S. had limited peer interaction. (*Id.* at 4.) Kushnir also reviewed reports, data, and evaluations of R.S.'s classroom conduct. (*Id.*)

2.    *Miller Testimony*

Miller is a speech-language specialist who conducts evaluations and provides special education students with speech and language therapy. (*Id.*) During the 2021-2022 school year, Miller evaluated R.S., interacted with him several times during the year, and conducted regular observations. (*Id.*) She was also part of a December 2021 IEP meeting between R.S.'s parents and

the District. (*Id.*) In May 2022, Miller evaluated R.S.'s speech and language abilities in general and self-contained classrooms. (*Id.*) She concluded that a self-contained classroom would benefit R.S. and noted that he did not interact with his peers often in either classroom setting. (*Id.*)

### 3. Mischik Testimony

Mischik works as a special education teacher in the District and has worked for the District for sixteen years. (*Id.* at 5.) She currently works in the in-class resource classroom. (*Id.*) Mischik testified that she observed R.S. during the 2020-2021 school year while he was learning remotely. (*Id.*) While his parents aided in his remote learning, Mischik still noticed that R.S. struggled to focus. (*Id.*) His parents attempted to help him, but Mischik reported ongoing behavioral issues, including his need for incentives and his struggle to make progress in general education settings. (*Id.*) She, consequently, recommended that he be placed in a self-contained classroom due to his difficulties in a general education classroom. (*Id.*)

### 4. Bianco-Stampfel Testimony

Bianco-Stampfel works for the District as a child psychologist and acts as a member of the child study team. (*Id.*) She specifically worked as R.S.'s case manager when he was in second grade. (*Id.*) As his case manager, Bianco-Stampfel considered his previous IEPs, data, evaluations, and progress reports, as well as conducted biweekly observations. (*Id.*) During the time period when she was conducting evaluations, R.S. was in a general education setting for half the day and was in a self-contained autism classroom for math and language arts for the remainder of the day. (*Id.*) She testified that he struggled to focus in a general education setting, frequently required prompting from his aide, and did not engage with other children in the classroom. (*Id.*) She also opined that R.S. benefited more from learning in a self-contained classroom, particularly because

he was less disruptive and could make strides in math and language arts. (*Id.*) Her testimony also noted that a self-contained environment for R.S. was the least restrictive environment. (*Id.* at 5-6.)

5.    *Schweiderek Testimony*

Schweiderek is a special education teacher in the District who worked as the in-class resource teacher in R.S.'s second-grade class. (*Id.* at 6.) As part of her duties, she helps disabled children modify their general education setting curriculum. (*Id.*) Schweiderek testified about R.S.'s typical day in a general education classroom. (*Id.*) She described his lack of interaction with other students, adding that he would not participate without encouragement. (*Id.*) Schweiderek also explained that R.S. had difficulty focusing, often removing his shoes to roll on the floor and that while R.S. would use his AAC device, it was often to ask for pretzels. (*Id.*) Based on these observations, Schweiderek opined that R.S. would learn best in a self-contained classroom. (*Id.*)

6.    *Fekete Testimony*

Fekete works for the District as a special education teacher. (*Id.*) She taught R.S.'s self-contained classroom for language arts and math. (*Id.*) As it pertained to the self-contained classroom, Fekete noted that the children's abilities, not their diagnoses, determine if they were placed in the self-contained classroom. (*Id.*) As R.S.'s teacher, she keeps daily logs about his progress and conducts assessments. (*Id.*) Fekete testified that R.S. uses his AAC device primarily to request snacks and that he struggles to focus. (*Id.*) She, however, added that he had made progress since entering her classroom, but it would ultimately be appropriate for him to remain in her classroom. (*Id.*)

7.    *Nadkar Testimony*

Nadkar is a board-certified functional behavioral analyst. (*Id.*) In April 2022, she conducted a functional behavioral assessment of R.S. and her findings were presented during the April 2022

IEP meeting. (*Id.*) She recommended a behavior intervention plan based on her observations of his outbursts, his difficulty with classroom transition, and his need to be prompted to use his AAC device. (*Id.* at 6-7.) Nadkar noted that these issues occurred in both the general education classroom and in the self-contained setting. (*Id.* at 7.) Consequently, she prepared a behavior intervention plan to address his behavior issues. (*Id.*)

8.      *Tracy-Bronson Testimony*

Tracy-Bronson was accepted as an expert in special education, education of students with intellectual disabilities, Down Syndrome, and inclusion education. (*Id.*) The ALJ noted, however, that Tracy-Bronson is not a licensed special education teacher in New Jersey but works with children with Down Syndrome, focusing on inclusive education. (*Id.*) Tracy-Bronson observed R.S. in general education and self-contained settings. (*Id.*) While Tracy-Bronson read R.S.'s IEP, the ALJ noted Tracy-Bronson did not consider other records, interview the IEP team, or conduct testing on R.S. (*Id.*) She did, however, opine in her expert opinion that R.S., like most Down Syndrome children, would benefit more from a general education setting. (*Id.*)

9.      *Whitbread Testimony*

Whitbread was accepted as an expert in special education, children with Down Syndrome, students with intellectual disabilities, and literacy instruction for special education students, based on her experience working with children with intellectual disabilities, including Down Syndrome. (*Id.*) Whitbread conducted an evaluation of R.S. and authored a report based on her interactions with R.S., which concluded, like most Down Syndrome students, that he would fare better in a general education classroom. (*Id.*) She noted that R.S. displayed disruptive and unfocused behaviors in both general education and self-contained classrooms. (*Id.*) Whitbread's testimony focused on inclusion education. (*Id.*) Whitbread made recommendations for the literacy and math

programs but did not opine as to why these recommendations could not be incorporated into the inclusion classroom, or why they would not be effective in the inclusion classroom. (*Id.*) Whitbread criticized the IEP for lacking clear goals and objectives and for taking R.S. out of a general education setting. (*Id.* at 8.)

        *10.*    *N.S. Testimony*

N.S., R.S.'s mother, described R.S.'s diagnosis at birth with Down Syndrome and an expressive language disorder and communication impairment. (*Id.*) She testified that R.S. began to exhibit behavioral problems and, as a result, repeated kindergarten. (*Id.*) During the 2020-2021 school year, R.S. attended school remotely and was assisted by his parents and an aide. (*Id.*) He returned to school in December 2021, and, after the holidays and a remote period, came back completely full-time in January 2022. (*Id.*) In February 2022, N.S. attended a meeting with the District and agreed to have R.S. undergo psychological, speech and language, and functional behavioral assessments. (*Id.*) Based on these assessments, which N.S. did not have time to review, the District convened the April 2022 meeting to change the IEP. (*Id.*) N.S. testified that she believed R.S. should be in a general education classroom, that he was not given adequate time to adjust to in-person learning, and that he belonged and would do better learning with students without disabilities. (*Id.*)

        *11.*    *Credibility Determinations*

After considering the above testimony and evidence, the ALJ made credibility findings. (*Id.* at 9.) The ALJ found the District's witnesses to be "sincere," "credible," and "consistent with documentary evidence and each other." (*Id.*) On the other hand, the ALJ explained that Plaintiffs' expert witnesses "did not discredit any of the testimony of the [D]istrict's witnesses" and "did not demonstrate that R.S. was being denied FAPE in the LRE . . . in the self-contained classroom."

(*Id.*) As to N.S.'s testimony, the ALJ found her testimony to be "sincere," but added "she provided no credible testimony that the District had failed to provide FAPE in the LRE." (*Id.*)

> 12.    *ALJ's Legal Conclusions*

Finally, the ALJ found that the documentary and testimony evidence supported R.S. being provided FAPE in the LRE. (*Id.* at 12.) The evidence and testimony, additionally, showed that the District was meeting its obligation to support a struggling student by changing the learning environment. (*Id.*) The ALJ also found that R.S.'s IEP change to accommodate his math and language arts education was supported by a team and data. (*Id.*) In sum, the ALJ found the District carried its burden to show R.S. was properly moved to a self-contained autism classroom for math and language arts. (*Id.*)

Following the ALJ's decision, Plaintiffs filed a Complaint in this Court. (ECF No. 1.) Plaintiffs bring three counts: (1) violation of the IDEA, 20 U.S.C. § 1400, *et seq.*; (2) violation of Section 504, 29 U.S.C. § 794; and (3) violations of Title II of the ADA, 42 U.S.C. § 12132. (*See* Compl. ¶ 1, ECF No. 1.) The District answered (ECF No. 8), and because the parties did not intend to bring new evidence before the Court, Plaintiffs filed the instant Summary Judgment motion (ECF No. 19).

## II.    **LEGAL STANDARD**

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record." *K.H. ex rel. B.Y. v. N. Hunterdon-Voorhees Reg'l High Sch.*, No. 05-4925, 2006 WL 2331106, at *4 (D.N.J. Aug. 10, 2006). Furthermore, "[t]he standard of review under which this Court considers an appeal of a[n ALJ's] decision under the IDEA differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of*

*Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003) (internal quotation marks and citation omitted). The motion, therefore, "[a]lthough framed as a motion for summary judgment, . . . is actually an appeal of the ALJ's ruling," *G.S. v. Cranbury Twp. Bd. of Educ.*, No. 10-774, 2011 WL 1584321, at *8 (D.N.J. Apr. 26, 2011), and the Court will "essentially conduct[] a bench trial based on a stipulated record." *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007) (internal citation omitted). The Court can, in its appellate role, grant judgment to the non-moving party *sua sponte* if that is warranted, provided the losing party was on notice and had the opportunity to present relevant evidence. *See* Fed. R. Civ. P. 56(f); *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) ("[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence." (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986))); *D.C. v. Mount Olive Twp. Bd. of Educ.*, No. 12-5592, 2014 WL 1293534, at *17 (D.N.J. Mar. 31, 2014) (granting judgment, *sua sponte*, to a nonmoving party in a review of an ALJ decision)).

"When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 563 (3d Cir. 2010) (internal quotation marks omitted) (citing *P.P. ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009)). "Moreover, the reviewing court must accept the ALJ's credibility determinations and 'may disturb them only upon a finding that non-testimonial extrinsic evidence justifies a contrary conclusion.'" *E.P. v. N. Arlington Bd. of Educ.*, No. 17-8195, 2019

12

WL 1495692, at *4 (D.N.J. Apr. 1, 2019) (quoting *C.S. v. Montclair Bd. of Educ.*, No. 16-3294, 2017 WL 4122433, at *5 (D.N.J. Sept. 18, 2017)). An ALJ's legal determinations, on the other hand, are reviewed *de novo*. *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011). "Applying these standards, the district court may make findings based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education." *Id.* (internal quotation marks omitted). That said, the party seeking relief or challenging the administrative decision bears the burden of persuasion. *Ridley*, 680 F.3d at 270.

## III.    DISCUSSION

After consideration of the administrative record and the parties' arguments, the Court denies Plaintiffs' Motion for Summary Judgment and grants judgment in favor of the District. The Court finds that the ALJ correctly concluded that the District did not violate IDEA in determining that R.S. was being provided with FAPE in the LRE by placing R.S. in a self-contained autism classroom for language arts and math, and therefore, the District did not violate Section 504 or the ADA.

### A.    Count One: Violation of IDEA

"The IDEA and implementing regulations set forth procedures school districts should follow to identify and evaluate children with disabilities." *J.M.*, 2020 WL 6281719, at *6 (citing *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 250 (3d Cir. 2012)). The IDEA mandates "education in the least restrictive environment that will provide [the child] with a meaningful educational benefit." *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 265 (3d Cir. 2003) (internal quotation marks and citation omitted); *see* 20 U.S.C. § 1412(a)(5)(A). The Third Circuit has

"interpreted this mandate to require that a disabled child be placed in the . . . [LRE] that will provide him with a meaningful educational benefit." *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 578 (3d Cir. 2000). A LRE "is the one that, to the greatest extent possible, satisfactorily educates disabled children together with children who are not disabled, in the same school the disabled child would attend if the child were not disabled." *Id.* at 578-79 (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 535 (3d Cir. 1995)).

In *Oberti*, the Third Circuit articulated a two-part test to determine whether a school district is in compliance with the IDEA's "mainstreaming requirement," which requires the school districts to educate children with disabilities with nondisabled children to the "maximum extent appropriate." *See T.R.*, 205 F.3d at 579 (citing *Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1215 (3d Cir. 1993)). First, a court must "determine whether the school can educate the child in a regular classroom with the use of supplementary aids and services." *S.H.*, 336 F.3d at 272. If the child cannot be educated in an integrated classroom, the court must "decide whether the school is mainstreaming the child to the maximum extent possible." *Id.*; *Oberti*, 995 F.2d at 1215 (quoting *Daniel R.R.*, 874 F.2d at 1048); *see also T.R.*, 205 F.3d at 579-80 (requiring the school district to consider "a continuum of possible alternative placement options when formulating an IEP"). This analysis requires an inquiry into "whether the school has made efforts to include the child in school programs with nondisabled children whenever possible." *Oberti*, 995 F.2d at 1215.

Plaintiff raises two related issues with respect to the ALJ's conclusion that R.S.'s placement in a self-contained classroom for language arts and math was a FAPE in the LRE. First, Plaintiffs argue that the ALJ failed to consider whether the District provided appropriate accommodations and modifications (or supplementary aids and services) to aid R.S. in the general

14

education setting. (Pls.' Reply Br. 5-6, ECF No. 25.) Second, Plaintiffs argue that the ALJ erred in failing to consider whether the self-contained classroom for language arts and math for 3.0 hours of the 6.5-hour school day was the LRE in which R.S. could receive an appropriate education to the maximum extent. (*See id.* at 6-7.) In making these arguments, Plaintiffs do not dispute the facts that formed the basis of the ALJ's decision. (*Id.* at 5-6.) Rather, Plaintiffs challenge the ALJ's legal analysis. (*Id.* at 2.) Specifically, Plaintiffs contend that in finding that the District had provided R.S. with FAPE in the LRE, the ALJ failed to mention and properly analyze the District's decision-making process under the two-part test set forth in *Oberti*. (*Id.* at 4.)

As the party seeking relief and challenging the ALJ's conclusion, Plaintiffs bear the burden of persuasion. *Ridley*, 680 F.3d at 270. Plaintiffs cannot meet their burden by merely arguing that the ALJ failed to explicitly mention the *Oberti* test in the decision. Rather, the critical issue here is whether the ALJ appropriately analyzed the relevant factors in reaching a decision. After a careful review of the record, the Court finds that the ALJ did so.

### 1.    *Education with the use of Supplementary Aids and Services*

Plaintiffs first argue that the ALJ erred in failing to properly consider whether the District can educate R.S. in a regular classroom with the use of supplementary aids and services. The Court disagrees.

To determine whether the District could educate a child in a regular classroom, courts consider: "(1) the steps the school district has taken to accommodate the child in a regular classroom; (2) the child's ability to receive an educational benefit from regular education; and (3) the effect the disabled child's presence has on the regular classroom." *T.R.*, 205 F.3d at 579.

Here, the Court finds that the ALJ considered and analyzed the relevant factors in determining whether R.S. could be included in a general education classroom with supplementary

aids and services. To begin, the ALJ considered the steps the District had taken to accommodate R.S. in a regular classroom. In the ALJ's decision, the ALJ noted when considering Kushnir's testimony that the "District had a functional behavior assessment conducted to address [R.S.'s] inability to keep his focus in [the general education setting and self-contained classroom]." (ALJ Op. 4.) The ALJ further explained that the District "also had an Augmentative and Alternative Communication (['] AAC Evaluation[']) to come up with an alternate communication plan for [R.S.]" (*Id.*) Only after doing so did the District's "IEP team [recommend] R.S. be moved to the self-contained classroom with a one-on-one aide and [that he be provided] the same supports for language arts and math." (*Id.*) Next, the ALJ considered the testimony of Miller and explained that the District had "conducted a speech and language evaluation in May of 2022, and observed R.S. in both the general education and self-contained classroom . . . [while] [R.S.] was using an iPad and the recommended AAC devi[c]e due to [R.S.'s] low functioning language and speech abilities." (*Id.*)

Second, the Court finds that the ALJ, in her decision, adequately considered R.S.'s ability to receive an educational benefit from regular education. Miller testified that she observed "very little interaction with other students in either the general education or self-contained classroom." (*Id.* at 4.) She opined that R.S. "needed to be in the self-contained classroom for math and language arts and that he was making progress." (*Id.*) Bianco-Stampfel also testified to her observations of R.S., describing R.S.'s "inability to focus and the supports that were constantly necessary to keep him focused in the general education setting." (*Id.* at 5.) The ALJ further explained that:

> [Bianco-Stampfel] opined that [R.S.] was most often prompted by his aide and without such prompting, she saw little participation or interaction with others from R.S. in the general education setting. Ms. Bianco-Stampfel testified that the self-contained classroom was set up in such a way that was more conducive to learning, and R.S. was able to focus more and participate in learning. She discussed

some of his self-stimulating behaviors and noted that she saw less of the disruptive behavior in the self-contained classroom.

(*Id.*) To further substantiate the ALJ's conclusion, the ALJ discussed the testimony of Schweiderek, the in-class resource teacher in R.S.'s second-grade class. (*Id.* at 6.) The ALJ emphasized Schweiderek's testimony that R.S. did not interact with other students, and R.S. was very distracted despite using his AAC device. (*Id.*) Schweiderek opined that, "R.S. belongs in a self-contained special education classroom in order to make any meaningful progress." (*Id.*)

Lastly, the ALJ considered the effect of R.S.'s presence on the classroom. For example, the ALJ considered Mischik's testimony, who was a special education teacher for the District. (*Id.* at 5.) Mischik testified that R.S. had "significant behavior issues. [R.S.] [also] had difficulty focusing in the classroom and was disruptive to other students." (*Id.*) The ALJ also explained the testimony of Nadkar based on her observations of R.S. in both general education and self-contained classrooms:

> [Nadkar] observed R.S. in the classroom and noted that he needs constant prompting from his aide in all settings. He exhibits flopping, eloping and episodes of crying. She observed these behaviors in both classrooms, noting that transitions are difficult for him. She testified that he uses the A[A]C device but often requires prompting to use it. She observed significant behavior issues in both general education and self-contained settings. She prepared a behavior intervention plan to address his behavior issues.

(*Id.* at 6-7.) Finally, the ALJ highlighted Bianco-Stampfel's testimony that "she saw less of the disruptive behavior in the self-contained classroom." (*Id.* at 5.)

As such, the Court rejects Plaintiffs' contention that the ALJ failed to consider in her decision whether the District can educate R.S. in a regular classroom with the use of supplementary aids and services. The Court, therefore, declines to disrupt those findings.

17

2. *Mainstreaming the Child to the Maximum Extent Possible*

Having found that R.S. could not be satisfactorily educated with the use of supplementary aids and services in a regular classroom, the ALJ moved on to the second step: assessing whether the District is mainstreaming R.S. to the maximum extent appropriate. Plaintiffs contend that the ALJ failed to do so. (*See generally* Pls.' Moving Br., ECF No. 19.) The Court, again, disagrees.

In determining whether a district had included a child in school programs with nondisabled children to the maximum extent appropriate, the *Oberti* Court recognized that the "continuum of alternate placements" is not "all-or-nothing." *Oberti*, 995 F.2d at 1218. A school must, however, take measures such as placement in a regular education classroom for some academic classes and in special education for others, mainstreaming a child for nonacademic classes only, and/or providing interaction with nondisabled children during lunch and recess. *Id.* Thus, even if a child with disabilities cannot be educated satisfactorily in a regular classroom, that child must still be included in school programs with nondisabled students whenever possible. *Id.*

Here, the Court finds that the ALJ considered whether the District was mainstreaming R.S. to the maximum extent possible when the District placed R.S. in a self-contained autism classroom for language arts and math. The ALJ's conclusion is evident from and supported by the record. In other words, the facts, which are supported by the record, support a finding that at the time of R.S.'s placement, R.S. could not receive an appropriate education in an environment less restrictive than being placed in a self-contained classroom for math and language arts (3.0 hours of the 6.5-hour school day).

At the outset, the Court notes that it is undisputed that R.S. was placed in general education for the majority of the school day except for two class periods, where he was in a self-contained classroom for language arts and math. (Def.'s Opp'n Br. 13, ECF No. 24.) Testimony summarized

by the ALJ from the District's witnesses—who are intimately familiar with R.S. and either observed or worked directly with R.S. in both the general education and self-contained settings—confirmed the challenges R.S. confronted and confirmed that the self-contained classroom was an appropriate choice in the LRE for R.S. *See, e.g.*, (ALJ Op. 4 (explaining Kushnir opined that she "did not agree that [R.S.] should stay in general education for all subjects"); *id.* (explaining that Miller opined that "[R.S.] needed to be in the self-contained classroom for math and language arts"); *id.* at 5 (explaining that Mischik agreed "with the recommendation that [R.S.] be placed in a self-contained classroom as [R.S.] was unable to participate in any meaningful way in the general education classroom").)

The evidence in the record further demonstrates that the District is mainstreaming R.S. to the maximum extent with non-disabled peers. "[R.S.] is with his non-disabled peers for morning meeting, science, social studies, special classes . . . lunch and recess" as well as "class parties and special events." (Def.'s Opp'n Br. 9, 13.) The District maintains that "the only time that R.S. is not integrated with his nondisabled peers is when he receives specialized instruction for [language arts] and [m]ath." (*Id.* at 13.) The ALJ also explained that testimony from the District's witnesses provided evidence that the school made genuine efforts to provide opportunities for interaction with nondisabled peers and for participation in general education programs. (*See generally* ALJ Op.)

In sum, after reviewing the record, the ALJ's decision, and the parties' briefing, the Court finds no error in the ALJ's analysis. The ALJ applied the correct legal standard, properly considered the record, and ultimately reached a decision that is supported by the facts and the law, *i.e.*, that the District did not deny R.S. a FAPE in the LRE by placing him in a self-contained classroom for math and language arts. As such, the Court sees no need to disturb the ALJ's

19

conclusions. The Court, accordingly, denies Plaintiffs' Motion for Summary Judgment as it pertains to the IDEA claim.

### B.      Counts Two and Three: Section 504 and the ADA [4]

Plaintiffs contend generally that the District violated Section 504 and the ADA by depriving R.S. of meaningful access to his education. (*See* Pls.' Moving Br. 33-37.) The District contends that since the District offered a FAPE to R.S. in compliance with IDEA, there is no Section 504 violation. (Def.'s Opp'n Br. 21 (citing *J.M. v. Summit City Bd. of Ed.*, 39 F.4th 126, 147 (3d Cir. 2022).) In other words, the District contends that the failure of Plaintiffs' IDEA appeal at Count One is fatal to Plaintiffs' Section 504 and ADA claims at Counts Two and Three. (*See id.*) The Court agrees.

To prevail under Section 504 and the ADA, a plaintiff must demonstrate that a student: "(1) has a disability; (2) was otherwise qualified to participate in a school program; and (3) was denied the benefits of the program or was otherwise subject to discrimination because of [his] disability." *Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) (citations omitted). Importantly, "a plaintiff cannot succeed on a discrimination claim "simply by proving[:] (1) that [he] was denied some service[;] and (2) [he] is disabled. [Instead, t]he [school] must have failed to provide the service for the sole reason that the child is disabled." *D.M. ex rel. Mr. J.M. v. East Allegheny Sch. Dist.*, No. 22-110, 2022 WL 4608672, at *4 (W.D. Pa. Sept. 30, 2022) (quoting *K.J. v. Greater Egg Harbor Reg'l High Sch.*, 431 F. Supp. 3d 488, 501 (D.N.J. 2019)).

---

[4] In the context of lawsuits considering the education of children with disabilities, the same standards apply to Section 504 and ADA claims. *Chisolm v. McManimon*, 275 F.3d 315, 324 n.9 (3d Cir. 2001); *see also Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 189 (3d Cir. 2009) ("[T]he same standards govern both [Section 504] and ADA claims.").

Here, Plaintiffs merely make Section 504 and ADA arguments analogous to their denial-of-FAPE claim under IDEA (*i.e.*, the District denied R.S. meaningful access to a FAPE by placing him in a self-contained classroom for language arts and math). Since this precise issue has already been decided in the District's favor and Plaintiffs provide no additional evidence to support their Section 504 and ADA claims, these claims must be dismissed. *See J.M.*, 39 F.4th at 147 (finding that "[d]epending on the factual basis for a denial-of-FAPE claim, the legal differences between the IDEA and § 504 may be of no moment" because where "parents do not succeed on their denial-of-FAPE claim, and they offer no additional evidence in support of their [Section] 504 claim" other than the evidence presented to support their denial-of-FAPE claim, "the failure of the denial-of-FAPE claim . . . forecloses the [Section] 504 claim"). For these reasons, Plaintiffs' Motion for Summary Judgment is also denied.

IV.    **CONCLUSION**

For the above reasons, the Court denies Plaintiffs' Motion for Summary Judgment and grants judgment in favor of the District. An appropriate order will follow this Memorandum Opinion.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE